**Jane FITTS, Plaintiff,**

v.

**FEDERAL NATIONAL MORTGAGE ASSOCIATION, et al., Defendants.**

**No. CIV.A.98–00617(HHK).**

United States District Court, District of Columbia.

Feb. 26, 2002.

David Elliot Schreiber, Bethesda, MD, John Michael Fedders, Washington, DC, John J. Witneyer, Richard B. Marrin, New York City, Thomas R. Esposito, Ford Marrin Esposito Witmeyer & Gleser LLP, New York City, for Plaintiff.

Mary Carolyn Cox, Wilmer, Cutler & Pickering, Washington, DC, John J. Witneyer, Richard B. Marrin, New York City, Frank Charles Morris, Jr., Teresa L. Jakubowski, Epstein, Becker & Green, P.C., Washington, DC, for Defendants.

## MEMORANDUM OPINION

KENNEDY, District Judge.

Plaintiff, Jane G. Fitts ("Fitts"), claims that defendants, her former employer, Federal National Mortgage Association ("Fannie Mae"), and its employee disability insurance provider, Unum Life Insurance Company of America ("Unum"), violated the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001 *et seq.*, because they determined that she was eligible to receive disability payments for only twenty-four months under a long term disability policy that limits disability payments for any Fannie Mae employee who develops a disability that is due to "mental illness." Presently before the court are the parties' cross motions for summary judgment. Fitts claims that defendants improperly classified her disability, bipolar disorder, as a mental illness and thus improperly subjected her to the disability policy's twenty-four month limitation of benefits provision. Defendants also seek summary judgment, arguing just the opposite. Upon consideration of the parties' motions, the opposition thereto, and the record in this case, the court concludes that plaintiff's motion for summary judgment should be granted and that defendants' motion for summary judgment should be denied.

## I. BACKGROUND

Fitts began to work as an attorney for Fannie Mae in 1982. In 1995, she was diagnosed with bipolar disorder and was unable to continue working.[1] Part of the employee welfare benefit plan that Fannie Mae offers to its workers includes a long-term disability insurance policy that is issued and administered by Unum. Under the policy, any employee who develops a disability is eligible for a certain package of benefits until age sixty-five The policy contains an exception, however. If the employee's disability is "due to mental illness," the employee's benefits are discontinued after twenty-four months. The policy defines mental illness as a "mental, nervous or emotional disease[ ] or disorder[ ] of any type."

After being diagnosed with bipolar disorder in 1995, Fitts applied for disability benefits. Her disorder was found to be disabling but, because the disorder was determined to be a mental illness, Fitts

was informed that she would receive disability payments for only twenty-four months. After defendants rejected Fitts's challenge to their determination that she was eligible to receive disability benefits for only twenty-four months, she filed this lawsuit.[2]

## II. ANALYSIS

■ The central question in this case is whether bipolar disorder is a mental illness and thus whether it was proper to limit Fitts's disability payments to twenty-four months pursuant to defendants' disability policy.[3] Fitts maintains that bipolar disorder is not a mental illness as defined in the policy and that the policy's definition of mental illness is ambiguous. Because the doctrine of *contra proferentem* requires ambiguous contract terms to be interpreted against the drafter, here the defendants, Fitts asserts that as long as her construction of the policy's provision regarding mental illness is reasonable,

1. Also known as manic depressive illness, bipolar disorder is a brain disorder that can cause dramatic mood swings, bouts of depression and hyperactivity, unusual shifts in energy levels, and an inability to function. *See* STEDMAN'S MEDICAL DICTIONARY, 460, 508, 1061 (26th ed.1995). Fitts has suffered from severe mood swings and an inability to concentrate.

2. This is the second time Fitts's claim has been considered by this court. When this suit was first filed, Fitts claimed that defendants violated the Americans with Disabilities Act (ADA), ERISA, and the District of Columbia Human Rights Act (DCHRA), and breached certain contractual and common law duties. This court (Urbina, J.) dismissed all of Fitts's claims except her ERISA claim. *See Fitts v. Federal Nat'l Mortgage Ass'n*, 44 F.Supp.2d 317, 331 (D.D.C.1999) (Urbina, J.). Judge Urbina subsequently granted defendants' motion for summary judgment on Fitts's ERISA claim. Judge Urbina held that it was appropriate to employ an abuse of discretion standard of review and found that defendants' classification of Fitts's infirmity as a mental illness did not constitute an abuse of that

discretion because the classification was reasonable. *See Fitts v. Federal Nat'l Mortgage Ass'n*, 77 F.Supp.2d. 9, 25 (D.D.C.1999) (Urbina, J.). On appeal, the D.C. Circuit affirmed the district court's dismissal of Fitts's non-ERISA claims but reversed the grant of summary judgment on her ERISA claim, holding that the district court should have reviewed the classification determination *de novo*. *See Fitts v. Federal Nat'l Mortgage Ass'n*, 236 F.3d 1, 6 (D.C.Cir.2001). Consequently, the case was remanded for a *de novo* determination of whether defendants properly classified Fitts's bipolar disorder as a mental illness. *See id.*

3. In resolving the parties' cross motions for summary judgment the court employs familiar standards. Under Federal Rule of Civil Procedure 56, summary judgment shall be granted if the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits show that there is no genuine issue of material fact in dispute and that the movant is entitled to judgment as a matter of law.

she should prevail. Fitts contends that it is reasonable to read the policy's mental illness exception to exclude bipolar disorder because of the illness' physical characteristics.

Defendants assert that bipolar disorder quite plainly and unambiguously is a mental illness and falls within the disability policy's mental illness limitation because bipolar disorder manifests itself emotionally and behaviorally. The court agrees with Fitts.

## A. The Parties' Positions

### 1. Fitts's Definition of Bipolar Disorder

Fitts alleges that her disorder is physical because she exhibits many of the physical components of the ailment. First, she argues that she is genetically predisposed to develop bipolar disorder because both her father and her brother showed symptoms consistent with the illness. According to Fitts, the link between her genes and the onset of her affliction demonstrates that bipolar disorder has a physical cause. Second, she notes that brain scans indicate that the parietal lobe on the left side of her brain has atrophied beyond what would be expected of a person of her age. Other scans show abnormal brain wave activity on the left side of her brain. See Fitts Decl., ¶¶ 32–33; see also Griffin Decl., ¶ 8 (noting that Fitts's condition demonstrates a genetic predisposition as well as changes in brain activity). Fitts also claims to suffer from headaches, chest pains and insomnia. Because of the physical changes affecting her as a result of her illness and the physical association between the body and bipolar disorder, Fitts asserts that the disease is not a "mental, nervous, or emotional disease[ ] or disorder[ ] of any type."

In support of her position, Fitts provides a declaration from Dr. Frederick T. Goodwin,[4] who states that bipolar disorder is a physical illness because it is a neurobiological disorder that affects the physical and chemical structure of the brain. According to Dr. Goodwin, the disorder is associated with chemical imbalances in the brain and other abnormal brain activity. Dr. Goodwin adds that studies indicate that bipolar disorder runs in families and that certain people have a genetic predisposition for developing the disease. Dr. Goodwin also states that the fact that many individuals with bipolar disorder respond to mood-altering drug therapy indicates that chemical imbalances in the brain affect bipolar disorder. According to Dr. Goodwin, drug studies suggest that bipolar disorder affects the brain's neurotransmitters and corresponds with organic lesions in the brain. While Dr. Goodwin stops short of saying that bipolar disorder has physical causes rather than merely physical correlations, he ultimately concludes that bipolar disorder is a physical illness because it is a disease afflicting a physical organ of the body just like diseases affecting the heart, the kidneys or the liver.

Dr. Goodwin's views are shared by Dr. Suzanne J. Griffin, a practitioner in the fields of psychology and pharmacology who has treated Fitts since 1996. Dr. Griffin characterizes bipolar disorder as a "biological disorder of brain function with a genetic inheritance pattern." Griffin Decl., ¶ 3. While Dr. Griffin admits that "the manifestations symptomatic of bipolar disorder are more obviously behavioral and emotional," she maintains that the physical changes in the brain that result in those manifestations make bipolar disorder a physical illness. Dr. Griffin also notes that

---

**4.** Dr. Goodwin specializes in psychology and pharmacology and is a research professor in the Department of Psychology at the George Washington University School of Medicine. Dr. Goodwin is also the author of the book *Manic Depressive Illness*.

bipolar disorder is linked to changes in blood flow to the brain similar to the changes exhibited in Alzheimer's disease or heart disease. Thus, Dr. Griffin concludes that "[d]epression is as physical as heart disease, the difference being that because of the function of the affected organ—i.e. the brain, depression gives rise to behavioral symptoms, more pronounced that [sic] those that also attend heart disease." Griffin Decl., ¶ 6.

### 2. Defendants' Definition of Bipolar Disorder

Defendants argue that bipolar disorder plainly qualifies as a "mental, nervous, or emotional disease or disorder of any type." In support of this position, present the declaration of Dr. Peter T. Mirkin.[5] Dr. Mirkin believes that bipolar disorder is a mental illness for two reasons. First, Dr. Mirkin points out that bipolar disorder is recognized in the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition (DSM–IV), which is accepted as "the official nomenclature of mental disorders" by many medical professionals. Mirkin Decl., ¶¶ 4–5. Second, Dr. Mirkin observes that bipolar disorder is typically treated by psychiatrists utilizing psychotherapy and psychotropic drugs. Dr. Mirkin agrees with Dr. Griffin and Dr. Goodwin that "biological and neurochemical changes can accompany bipolar disorder," admits that there is evidence that individuals may inherit a genetic predisposition for the disease, and concludes that while the cause of bipolar disorder remains unknown, the disorder probably results from a combination of physiological, psychological and social factors. Mirkin Decl., ¶¶ 6, 8. He cautions, however, that the mere existence of biological markers does not make bipolar disorder a physical illness because all illnesses recognized in DSM–IV may correlate with biological changes. Dr. Mirkin also states that the relationship between blood flow changes and bipolar disorder is unclear and that blood flow changes are not always present in individuals suffering from bipolar disorder.

Defendants also present the declaration Dr. Robert A. Haines, a board certified psychologist employed by Unum, in support of their position. Dr. Haines states that bipolar disorder is a mental illness for many of the same reasons as Dr. Mirkin. Dr. Haines concludes that bipolar disorder is a mental illness because it is "characterized predominantly by a cognitive, emotional or behavioral abnormality," regardless of any physiological connections to the disease. Haines Decl., ¶ 12. Dr. Haines acknowledges that although the psychiatric community has not yet identified the causes of bipolar disorder, there is some evidence favoring a genetic predisposition. Dr. Haines also notes that treatment with psychotropic drugs is evidence that bipolar disorder is a mental illness, but notes that psychotropic drugs, such as lithium, operate by altering the chemical balance in the brain.[6]

### B. Principles of Construction of ERISA Benefit Plans

Because Fitts's claim involves an employee benefit plan, it is governed by ERISA rather than state contract law. ERISA requires that terms in benefits plans "be written in a manner calculated to be understood by the average plan participant," 29 U.S.C. § 1022(a)(1). Conse-

---

5. Dr. Mirkin is a medical doctor employed by Unum. Dr. Mirkin specializes in psychology and has been board certified in that field since 1987.

6. Defendants also supply a declaration from Dr. Sharon Hogan, an internist employed by Unum. Her conclusions, however, do not differ significantly from those of Drs. Mirkin and Haines.

quently, those terms should be given the meaning normally attributed to them by a person of average intelligence and experience. *See Phillips v. Lincoln Nat'l Life Ins. Co.*, 978 F.2d 302, 308 (7th Cir.1992). While an expert's definition of a contract term is not controlling, the court can rely on expert opinion as a way of determining a term's ordinary meaning. *See, e.g., Kunin v. Benefit Trust Life Ins. Co.*, 910 F.2d 534, 536 (9th Cir.1990).

The reach of ERISA is broad and sweeping, as the Act was designed to preempt state laws regarding employee benefit plans. *See* 29 U.S.C. § 1144(a); *Brewer v. Lincoln Nat'l Life Ins. Co.*, 921 F.2d 150, 153 (8th Cir.1990). Congress, in passing ERISA, anticipated that "a federal common law of rights and obligations under ERISA-regulated plans would develop." *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 56, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987). Thus, federal law controls the disposition of this suit.

■ The doctrine of *contra proferentem* requires courts to construe ambiguous terms in insurance contracts strictly in favor of the insured and against the insurer. *See Germany v. Operating Eng'rs Trust Fund*, 789 F.Supp. 1165, 1170 (D.D.C.1992). While *contra proferentem* is a state law doctrine of contract interpretation, it has been applied in the ERISA context as a matter of federal common law. *See id.*[7] The doctrine is applied to insurance contracts because insurance contracts are typically drafted by the insurance company, because insurance companies tend to be repeat players with greater expertise and experience in insurance matters than plan beneficiaries, and because beneficiaries have no opportunity for arms-length negotiation over the terms of the plan. *See, e.g., Phillips*, 978 F.2d at 307; *Germany*, 789 F.Supp. at 1170. Because of the gap in bargaining power and experience between the parties, insurers must clearly spell out any limitations on coverage in a way easily understood by a layperson, and cannot take advantage of ambiguities of their own creation. *See Kunin*, 910 F.2d at 540; *Germany*, 789 F.Supp. at 1170.

■ The doctrine is applied only in situations where the contract language is ambiguous, however, and the court will not create an ambiguity where none exists. *See Phillips*, 978 F.2d at 308. A contract provision is ambiguous if it is susceptible to two or more reasonable interpretations. *See Papago Tribal Utility Auth. v. FERC*, 723 F.2d 950, 955 (D.C.Cir.1983); *see also Carey Canada, Inc. v. Columbia Cas. Co.*, 940 F.2d 1548, 1556 (D.C.Cir.1991) (defining ambiguity with regard to terms in insurance contracts).

## C. The Legal Landscape Regarding Mental Illness

Courts are split over whether ailments like bipolar disorder fall within the defini-

---

7. Defendants argue that *Germany's* discussion of *contra proferentem* is dicta and that the Supreme Court's holding in *Firestone Tire and Rubber Co. v. Bruch* prohibits application of the doctrine in the ERISA context. *See Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 112, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989) ("As they do with contract provisions, courts construe terms in trust agreements without deferring to either party's interpretation."). While the D.C. Circuit has yet to rule on whether *contra proferentem* applies in the ERISA context, this court agrees with *Germany* as well as the vast majority of circuit courts that have found the doctrine applicable in ERISA cases. *See, e.g., Hughes v. Boston Mutual Life Ins. Co.*, 26 F.3d 264, 268 (1st Cir.1994); *Masella v. Blue Cross & Blue Shield of Connecticut*, 936 F.2d 98 (2d Cir. 1991); *Heasley v. Belden & Blake Corp.*, 2 F.3d 1249 (3d Cir.1993); *Glocker v. W.R. Grace & Co.*, 974 F.2d 540 (4th Cir.1992); *Todd v. AIG Life, Ins. Co.*, 47 F.3d 1448, 1451–52 (5th Cir.1995); *Phillips*, 978 F.2d at 311; *Delk v. Durham Life Ins. Co.*, 959 F.2d 104, 105–06 (8th Cir.1992); *Kunin*, 910 F.2d at 540–41; *Lee v. Blue Cross/Blue Shield of Alabama*, 10 F.3d 1547, 1551 (11th Cir.1994).

tion of mental illness contained in employee benefit plans. Courts that have addressed the issue have taken three basic approaches. They have either focused on the infirmity's (1) manifestations, i.e., its symptoms or (2) its causes or (3) its method of treatment, whether medically or psychiatrically.

Courts that favor a symptom-based approach have concluded that laypeople are more likely to recognize the symptoms of an illness than to understand its causes.[8] *See, e.g., Lynd v. Reliance Standard Life Ins. Co.,* 94 F.3d 979, 983–84 (5th Cir. 1996); *Brewer,* 921 F.2d at 154 ("[L]aypersons are inclined to focus on the symptoms of an illness; illnesses whose primary symptoms are depression, mood swings and unusual behavior are commonly characterized as mental illnesses regardless of their cause."); *Equitable Life Assurance Soc'y v. Berry,* 212 Cal.App.3d 832, 840–41, 260 Cal.Rptr. 819 (1989) (holding that "[m]anifestation, not cause, is the yardstick" for defining mental illness). Because bipolar disorder, depression and other similar illnesses manifest themselves primarily through behavioral and emotional changes, courts using a symptom-based definition of mental illness have routinely found such disorders to be mental illnesses. *See, e.g., Tolson v. Avondale Indus., Inc.,* 141 F.3d 604, 610 (5th Cir.1998) (defining depression as a mental illness); *Lynd,* 94 F.3d at 983–84 (classifying "major depressive disorder" as a mental illness); *Brewer,* 921 F.2d at 154 (considering mood disorders to be mental illnesses); *Pelletier v. Fleet Fin. Group,* 2000 WL 1513711 (D.N.H. Sept. 19, 2000) (classifying major depressive disorder as a mental illness); *Attar v. Unum Life Ins. Co.,* 1997 WL 446439 (N.D.Tex. July 19, 1997) (defining bipolar disorder as a mental illness);

*Berry,* 212 Cal.App.3d at 840–41, 260 Cal. Rptr. 819 (defining manic depression as a mental illness). One pillar of this position is the view that a cause-based definition of mental illness would effectively read out a disability plan's mental illness exception because some physical cause can be identified for any illness. *See, e.g., Lynd,* 94 F.3d at 983 n. 5 ("In identifying the 'causes' and 'symptoms' of illnesses, it seems that an argument could always be fashioned that the illness itself should be viewed as a 'symptom' of some underlying 'physical' cause; this is particularly true if one is willing to trace the origins of the illness *ad infinitum.*").

Courts taking a cause-based approach have typically decided in favor of insureds, either because they found the definition of mental illness in a disability policy to be ambiguous, *see, e.g., Phillips,* 978 F.2d at 308, or because they found that diseases such as bipolar disorder were physical illnesses. *See, e.g., Arkansas Blue Cross & Blue Shield, Inc. v. Doe,* 22 Ark.App. 89, 733 S.W.2d 429, 432 (1987) (affirming the district court's determination that bipolar disorder is a physical illness). Courts using a cause-based classification have held that defining mental illness as an illness having no organic cause whatsoever is reasonable. *See, e.g., Phillips,* 978 F.2d 302; *Kunin,* 910 F.2d at 541. These courts find a symptom-based definition for mental illness to be unsatisfying principally because such a definition logically would exclude many ailments that lay people would commonly consider to be physical illnesses, such as abnormal behavior caused by a head injury or brain trauma, brain cancer, Alzheimer's disease, or delirium resulting from a fever or staph infection. *See, e.g., Phillips,* 978 F.2d at 306 & n. 2.

---

**8.** Symptoms such as mood disorders, mood swings, depression, aberrant behavior, sleeplessness, impaired concentration, and irritability have been considered indications of a mental illness. *See, e.g., Stauch v. Unisys Corp.,* 24 F.3d 1054, 1056 (8th Cir.1994).

Finally, some courts consider the method of treatment in determining whether an illness is mental or physical. Thus, illnesses treated by psychiatrists employing psychotherapy and psychotropic medication have been considered to be mental illnesses. *See, e.g., Blake v. Unionmutual Stock Life Ins. Co.*, 906 F.2d 1525, 1530 (11th Cir.1990) (noting that the plaintiff's postpartum depression was properly considered a mental illness because "she was treated primarily by psychiatrists receiving well recognized psychiatric treatment, including individual psychotherapy, psychoactive drug therapy, electroconvulsive therapy and participation in group sessions."); *see also Simons v. Blue Cross & Blue Shield of Greater New York*, 144 A.D.2d 28, 536 N.Y.S.2d 431, 434 (N.Y.A.D. 1st Dept.1989) (finding that coverage for the plaintiff's hospitalization for anorexia nervosa was not excluded by the insurance contract's mental illness limitation because the patient received treatment for the physical problems from anorexia-malnutrition and hypotension-even though anorexia could be considered a psychiatric condition).

## D. Is Bipolar Disorder Unambiguously a "Mental Illness"?

Defendants make three principal arguments in support of their position that bipolar disorder is a mental illness that plainly falls within their disability policy's's definition for mental illness. First, defendants assert that the wording of the policy's definition of mental illness as "mental, nervous or emotional disease[ ] or disorder[ ] of any type" unambiguously refers to and includes bipolar disorder. Second, relying on cases that hold that the symptoms of a disorder like bipolar disorder supply the test for determining whether it is a mental illness, defendants assert that bipolar disorder plainly is a mental illness because of the way it manifests itself. Third, defendants contend that bipolar dis-

order is readily and unambiguously marked as a mental illness because it appears in DSM–IV. Defendants' arguments are unconvincing.

Defendants' argument that bipolar disorder plainly falls within their disability policy's definition for mental illness is patently without merit because the plan's definition merely re-phrases the term mental illness by using equally vague terms. *See, e.g., Elam v. First Unum Life Ins. Co.*, 72 Ark.App. 54, 32 S.W.3d 486, 491 (2000), *rev'd on other grounds,* 346 Ark. 291, 57 S.W.3d 165 (2001) ("The policy's definition [of mental illness as 'mental, nervous, or emotional diseases or disorders of any type'] is not helpful. It merely begs the question by essentially defining mental illness as a mental disease or disorder."). The definition fails to specify whether a disability qualifies as a mental illness based on its causes, symptoms, forms of treatment, markers, or other aspects. *See Patterson v. Hughes Aircraft Co.*, 11 F.3d 948, 950 (9th Cir.1993) (finding language identical to the language employed by the disability policy in this case to be ambiguous because it did not specify whether mental illness should be defined by cause or symptom). *But see Pelletier,* 2000 WL 1513711 at *4 n. 7 (finding identical language to be unambiguous when applied to major depressive disorder).

Defendants' argument that the symptoms of certain disorders supply the test for determining whether they are mental illnesses is also unconvincing. At the outset, the court observes that several of the cases on which defendants rely do not stand for the proposition that the symptoms of illnesses like bipolar disorder necessarily define them as either "mental" or "physical." For example, defendants cite *Parker v. Metropolitan Life Insurance Co.*, 99 F.3d 181, 185 (6th Cir.1996), *vacated upon grant of reh'g en banc,* 107 F.3d

359 (6th Cir.1997).[9] *Parker* held that the district court properly determined that severe depression was a nervous or mental disorder. *See Parker* 99 F.3d at 185. The Sixth Circuit affirmed the district court's decision, however, under an abuse of discretion standard of review. The Sixth Circuit admonished that "[i]f the standard of review were *de novo*, perhaps there would be a genuine issue of material fact as to whether chemical imbalances which lead to depression are 'physical' or 'mental' disorders." *Id.*

Defendants' reliance on *Blake v. Unionmutual Stock Life Insurance Co.* is similarly misplaced. In *Blake*, the Eleventh Circuit affirmed the district court's determination that the plaintiff's psychiatric treatment was evidence that her depression was a mental illness. *See Blake*, 906 F.2d at 1530. The evidence of psychiatric treatment was determinative, however, only in light of the lack of proof of any physical cause for the plaintiff's disorder. *See id.* ("Because of Plaintiff's failure to prove an organic causation for this illness, we find the treatment [the plaintiff] received is only more convincing proof that she suffered a mental illness within the terms of the policy.") It is not at all clear then that the court would have found the plaintiff's illness to be mental in nature if the plaintiff had presented evidence of physical causation. *See Phillips*, 978 F.2d at 309 ("[O]ur reading of *Blake* leads us to conclude that had the plaintiff demonstrated an organic basis for her illness, the Eleventh Circuit may well have held that

the policy's mental illness limitation did not apply.").

Setting aside the cases that do not stand for the proposition for which they are cited, this court disagrees with those courts that have found that an infirmity like bipolar disorder is unambiguously defined as a "mental illness" because of its emotional and behavioral symptoms. A primary rationale offered by these courts is that lay people do not know what causes illnesses like bipolar disorder but can and do recognize their symptoms. *See, e.g., Brewer*, 921 F.2d at 154. This rationale only goes so far.[10] While lay people indeed may not know the root causes of a particular disease, undoubtedly they recognize that diseases have causes in the same way that they recognize that diseases have symptoms. Therefore, they may think, reasonably so in our view, that looking to a disease's cause is an appropriate way of classifying it as "mental" or "physical," despite not having specific knowledge of a particular disease's cause.[11]

Moreover, even if lay people look to an illnesses' symptoms to define it at a particular point in time they may not continue to do so as new information about the illness becomes available. As one court recently stated:

> We are not so simple or dualistic that our minds and bodies work, or disfunction, [sic] separately. The manner in which we become sick, the symptoms we exhibit, and the manner in which we are healed often involve the mind, the body,

**9.** The Sixth Circuit's decision was vacated on other grounds and the *en banc* ruling did not address the plaintiff's ERISA claim.

**10.** Lay people may not know the specific symptoms of a particular disease either. There may be many diseases that lay people have never heard of, or know little about, either as to cause, symptom, or treatment. However, the fact that lay people may know little about certain illnesses does not mean

that they would not be able to define mental illness, nor does it mean that they would not apply their definition to illnesses about which they know little.

**11.** The causes of many diseases still elude medical professionals as well. Just because medical experts do not know the cause of a disease, however, does not mean that they do not recognize the value of looking to cause as a way of classifying an illness.

or a combination of both. Further, advances in medicine and the wide dissemination of medical knowledge among the lay public has had the effect of altering perceptions as to what constitutes a mental illness....

The question of what constitutes a mental illness is obviously a mutable, evolving concept. We are therefore reluctant to adopt a hard and fast rule, as the Eighth Circuit did in *Brewer, supra,* when it declared that the nature of an illness is determined by its symptoms. Illnesses can seldom be classified so simply.

*Elam,* 32 S.W.3d at 489–90. Because new information about certain illnesses, particularly those affecting the brain, alters the perception of what lay people consider to be the essential characteristics of those illnesses, placing the focus on an illness' symptoms does not make its definition unambiguous.

Further still, a symptom-based definition for certain illnesses is unsatisfying because such a definition logically operates to turn illnesses that lay people might consider physical, such as brain damage resulting from an accident or a head injury, delirium caused by a fever or staph infection, brain cancer, a stroke with the effect of limiting the sufferer's cognitive abilities, or Alzheimer's disease, into mental illnesses. *See Phillips,* 978 F.2d at 306 & n. 2. This, of course, does not mean that a cause-based definition is superior to a symptom-based one, because a cause-based definition may end up classifying certain illnesses as physical that a layperson would consider mental. But the fact that both definitions are intuitively appealing, while not wholly satisfying, suggests that neither definition is more reasonable than the other.

Finally, this court is unpersuaded by defendants' argument that bipolar disorder is readily and unambiguously marked as a mental illness because it appears in DSM–IV. This widely used source of information for medical professionals itself posits that the distinction between mental disorders and physical illnesses is a false one and that the phrase "mental disorder" is susceptible to multiple interpretations. The manual states:

> [T]he term *mental disorder* unfortunately implies a distinction between "mental" disorders and "physical" disorders that is a reductionistic anachronism of mind/body dualism. A compelling literature documents that there is much "physical" in "mental" disorders and much "mental" in "physical" disorders. The problem raised by the term "mental" disorders has been much clearer than its solution, and, unfortunately, the term persists in the title of DSM–IV because we have not found an appropriate substitute. Moreover, although this manual provides a classification of mental disorders, it must be admitted that no definition adequately specifies precise boundaries for the concept of "mental disorders."

DSM–IV, at xxi. Thus, according to DSM–IV, the term mental illness is inherently ambiguous because no adequate definition exists.[12]

---

12. This is not to say that limitations in employee benefit contracts regarding "mental" infirmities could never pass muster. The court holds only that an employee contract that defines mental illness no more specifically than as "mental, nervous, or emotional disease or disorders of any type" is ambiguous. Better drafting is the key. *See, e.g., Luton v. Prudential Ins. Co.,* 88 F.Supp.2d 1364, 1366 (S.D.Fla.2000) (evaluating a disability plan that limited benefits for any disability "caused at least in part by a mental, psychoneurotic or personality disorder"); *In re Campbell,* 116 F.Supp.2d 937, 941 (M.D.Tenn.2000) (examining a disability policy defining mental illness to specifically include depression as well as any disorder "caused by chemical imbalance.").

In sum, the court rejects defendants position that bipolar disorder is plainly an illness that falls within their disability policy's definition of mental illness. While mere disagreement does not suffice to create ambiguity, the lack of consensus on the meaning of mental illness and the prevalence of different definitions for the term indicate that more than one reasonable interpretation of the term exists. Particularly telling are the declarations presented by the parties' experts. The doctors for both parties are in general agreement on the possible causes and manifestations of the illness. They each acknowledge that bipolar disorder is characterized by a combination of physical, psychological and social factors, and they generally agree as to what those factors are. The primary area of contention is whether those factors make bipolar disorder a mental illness or a physical illness. Thus, the dispute is not over the factors affecting the cause, manifestation, or treatment of the disorder, but over how those factors should be interpreted. For one party, the existence of physical characteristics makes the illness physical. For the other party, the emotional manifestations make the disease mental. That the dispute is over definitions, rather than facts, demonstrates that the term mental illness is ambiguous.

Thus, the court finds that the definition of mental illness contained in the defendants' long term disability plan is ambiguous. Further, the court concludes that the summary judgment record provides sufficient evidence of the physical relationship between the body and bipolar disorder[13] to support Fitts's position that her disorder does not fall within the plan's definition of mental illness. Consequently, applying the principle of *contra proferentem*, Fitts's interpretation prevails and she is entitled to judgment on her ERISA claim.

13. This evidence includes genetic predisposition, chemical imbalances in the brain, brain

## III. CONCLUSION

For the reasons set forth in this memorandum, the court grants plaintiff's motion for summary judgment and denies defendants' motion for summary judgment. An appropriate order accompanies this memorandum.

## JUDGMENT

Pursuant to Fed.R.Civ.P. 58, and for the reasons set forth in the accompanying Memorandum Opinion, it is this 26th day of February, 2002, hereby

**ORDERED** that **Judgment** is entered in favor of **Plaintiff**. Further, Plaintiff is entitled to prejudgment interest on all sums due her and the costs of this action.

lobe atrophy, as well as other brain abnormalities.